The opinion of the Court was delivered by
Inglis, A. J.
Charles Spann, Jr., died in 1834, intestate, leaving a widow, Eleanor, and six children. Administration of the personal estate was granted to - the widow, and E. Eussel Spann and John E. Spann, Sr., became the sureties on her bond. In June, 1837, under proceedings for the purpose in the Court of Equity, partition was made of the whole property'then remaining, consisting of realty valued at seventeen thousand dollars, and personalty valued at sixty-one thousand dollars. But, as there were still outstanding debts of the intestate, the order of confirmation *85 directed “ that the property should continue subject in the hands of the distributees to any judgment or execution which should be obtained against the administratrix for debts due by the estate; that the adult distributees, and the guardians of the infants, should give bond, with sureties, to the administratrix for the production of the property allotted to them, to satisfy any such judgments or executions ; that the negroes and other property allotted to the adults should be delivered to them, and the slaves and other property allotted to the minors should be retained for them by the administratrix, until they should respectively attain the age of twenty-one years, or marry, or until a legally appointed guardian should give bond and security according to law, when the property should be delivered to such guardian; and that in case any suits, judgments or executions, either in law or equity, should be obtained against the administratrix for debts due by the estate, the same should have a lien upon the slaves and other property of the estate of Charles Spann, Jr., deceased, allotted and delivered to each, which should be subject to be sold under and by virtue thereof.” Under this order, the distributees went into possession of their respective shares, the adults at once, and the infants as they severally successively came of age. The forthcoming bonds directed to be given to the administratrix were not exacted by her.
In the partition of the realty, a tract of land called “ Buz-, zard Boost” was assigned to the three then infant children, John B. Spann, Jr., Caroline M., and Mary E., and through several mesne conveyances had, at the institution of these proceedings, become and now is vested in Henry Spann.
Another portion of the intestate’s lands, consisting of three tracts, known as the Orange Grove, Britton Hair, and Fullerton tracts, was assigned to the widow, and by subsequent conveyances was vested in Hastin Jennings, holding in some unexplained way for the benefit of John E. Spann, *86 Jr. S. Porcher Gaillard, desiring to have certain funds, held by trustees for the separate use of his wife, invested in this land, on the 3v0th December, 1842, entered into a written contract to this end.with Jennings and Spann, for the particular terms of which reference must be had to plaintiffs’ exhibit B, copied in the brief. In order to relieve this parcel of land of the liens upon it, supposed to have been created by virtue of the order in equity of June, 1837, by certain judgments, &c., presently to be more particularly mentioned, it was seized, and, after due advertisement, sold on sale-day in February, 1843, under execution against the administratrix of Charles Spann, Jr., bid off by Hastin Jennings, at the nominal sum of ten dollars, and conveyed by him to the trustees of Mrs. Gaillard, who now hold it. Gaillard thereupon paid the cash portion of the purchase-money, and, at some early day afterwards, the credit portion ; but no part of either payment was applied towards the. satisfaction of the debts of Charles Spann, Jr., except, perhaps, the amount of the bid.
,On 12th June, 1841, the Bank of Charleston, and the executors of Inglesby, severally recovered judgments in the Common Pleas, against Eleanor Spann, administrati’ix, for the execution of which judgments writs of fieri facias were duly lodged. On sale-day in February, 1843, fourteen negro slaves, part of the distributed estate of Charles Spann, Jr., were produced by certain of the distributees, a levy thereof given to the Sheriff* advertisement dispensed with by the consent of the creditor and the distributees produc- • ing them, and a sale of them made for a sum about sufficient to satisfy both judgments. John E. Spann, Jr., was the purchaser, and the negroes were delivered to him. E. Bus-sel Spann, one of the sureties on the administration bond, probably induced by the advertisement of the land above mentioned, was 'present at the sale to protect the sureties, and, having previously ascertained the amount of the judg *87 ments, ran up the bidding on each lot, until an aggregate had been reached about sufficient to cover the amount so ascertained. If the property had been knocked down to him, payment of the purchase-money, or of any deficiency on a resale in case of non-compliance, could not, perhaps, have been enforced by legal process. But he had the command of considerable means, the income of property belonging to his family, and, with the aid of the other surety, equally interested and a man of large resources, could readily have paid his bids. The negroes having thus brought a sum nearly or quite sufficient to satisfy the judgments, the tract of land which had been bargained to Gaillard was sold without competition.
John E. Spann, Jr., did not pay for the negroes at the time of delivery to him, and had not paid for them before the next sale-day. The delivery, without payment, was made by the Sheriff, at the instance of the creditor, In-glesby, between whom and the purchaser there was some understanding, according to which the purchaser, during the course of the ensuing month, was to satisfy the creditors for the amount of his bid by a private arrangement, or, failing that, the negroes were to be resold on the next sale-day. By reason of instructions received in the interval from Inglesby, the Sheriff did not resell on sale-day in March, as he says he would otherwise have done. The negroes, if resold in March, would have brought larger prices than on the original sale. Negotiations between Inglesby and the purchaser, John E. Spann, Jr., seem to have continued without results satisfactory to the'former until October, 1845, a period of two years and eight months, wired, for the first time, the Sheriff was instructed to reseize and resell. John E. Spann, Jr., refused to deliver, and an action of trover was commenced by the Sheriff. In consequence of this obstruction to the Sheriff’s proceedings, no resale took place till November, 1847, four years and nine *88 months from the date of the first sale. The original bids for four of the negroes were then paid, and those not paid for were surrendered to the Sheriff and resold. In the meantime, by the long possession of the purchaser, under an apparent title acquired at Sheriff’s sale, and intervening encumbrances on his estate therein, the liability of the property to the claims of the intestate’s creditors had come into great doubt, if it had not, as against the creditors of the purchaser, been entirely defeated. The sale was forbid by various persons, among whom was Hastin Jennings; and the ten negroes brought, in all, only one hundred and fifty dollars. So far as appears to the Court, these negotiations between the creditor, Inglesby, and the purchaser, John R. Spann, Jr., the conditions attached, as it is said, to the delivery of the negroes to the latter, and all that followed, were not only without the concurrence but even without the knowledge of the defendant in execution, Eleanor Spann, administratrix, or her sureties. In the meantime, other personal assets of Charles Spann, Jr., which had been allotted and delivered to the distributees, had been removed from the jurisdiction or otherwise scattered.
The sale to John R. Spann, Jr., having thus failed to result in actual satisfaction in money, the Bank of Charleston instituted suit upon the administration bond against the sureties thereto, suggesting a devastavit, and, after much delay and litigation, recovered judgment for the penalty, and had their damages assessed for the balance of their debt, which recovery has been paid by the sureties in equal parts.
In 1857 Inglesby’s executors sued out a scire facias to revive this judgment against the sureties, and to'recover the balance claimed to be due on his debt, by a further assignment of breaches and a new assessment. Thereupon the sureties filed their present bill, wherein they set forth various' supposed equities as against the creditor, *89 Inglesby, wherefore he should not have the recovery sought at law against them, particularly his interference with the sale of February, 1843, whereby the real value of the property of their principal then sold, which was entirely sufficient to satisfy the debts of her intestate, as at that time existing, was prevented from being made available in fact for this purpose; and pray that he may be restrained by injunction from proceeding further in his suit at law “ touching the matter in question.” The bill also insists that, by virtue of the contract of December 30, 1842, between Hastin Jennings and John R. Spann, Jr., and S. Porcher Gaillard, a trust was created in the money agreed to be paid for the land therein bargained, for the judgment creditors of Charles Spann, Jr., and the satisfaction of their demands, and that therefore if, notwithstanding the supposed equity to the contrary, the creditor, Inglesby, shall be permitted to enforce his demand, satisfaction thereof shall be decreed primarily out of the trust fund thus created; that the real proper|y of the intestate, Charles Spann, Jr., partitioned in June, 1837, is, under the order of that date, still liable to levy and sale under the creditors’ execution at law, and the trust fund created as above failing or proving insufficient, the creditor shall be required to resort to his legal remedy against this realty; and that the sureties shall be subrogated as against these several funds to the rights which the Bank of Charleston, as a creditor of Charles Spann, Jr., had to be satisfied thereout, and so be reimbursed the amounts paid by them respectively for the satisfaction of that debt.
On the hearing below, the Chancellor held that the plaintiffs are entitled to no relief as against the creditor, Inglesby, by reason of the interference of the latter in the matter of the Sheriff’s sale of February, 1843, or otherwise; that no trust was created for the creditors of Charles Spann, Jr., by the agreement of December 30, 1842, between S. *90 Porcher Gaillard and Hasfcin Jennings and John R. Spann, Jr.; that any lien which, under the order in equity of June, 1837, attached upon the land bargained to Caillard in that agreement in favor of the creditors of Charles Spann, Jr., upon the recovery of their judgments, was discharged by the sale under execution to Jennings; but that “Buzzard Roost,” part of the real estate of Charles Spann, Jr., in the hands of Henry Spann, a purchaser from several of the distributees, is liable for the relief of the sureties against the Inglesby debt, and for the reimbursement of the amount paid by them in satisfaction of the debt to the Bank of Charleston, to the extent of the proportions which Caroline M. and Mary E., two of the distributees from whom Henry Spann derived title, ought to have contributed of their portions towards the satisfaction of the debts, and he ordered accordingly.
The plaintiffs, being the sureties of the administratrix, the defendant, Henry Spann, and the creditor, Inglesby, have all appealed, and in their grounds of objection to the circuit deoree have raised several questions, the judgment of this Court on three of which will dispose of the whole case:
1. Have the plaintiffs shown an equity to have the defendant, Inglesby, restrained from proceeding in his action at law ? The correct' answer to this inquiry depends on the effect proper to be given to the facts which have been' recited touching the Sheriff’s sale of February, 1843, and this defendant’s conduct therein.
On that occasion negro slaves, which, under the order in equity of June, 1837, must, for the purposes of such sale, and as among all the parties connected therewith, be considered as still, at that time, the property of the defendant in execution, to wit, Eleanor Spann, in her capacity of ad-ministratrix, were sold for an aggregate sum sufficient to *91 satisfy the debt, a recovery of which against these plaintiffs is sought in the action to be restrained. And the slaves so sold were delivered to the purchaser. Certainly, if nothing more than this had occurred, satisfaction in fact must have resulted, and the Sheriff have been responsible, for the amount of the bid, to the persons entitled. The additional fact, that the bidder did not pay his bid, could not, of itself, change the result. (Towles vs. Turner, 3 Hill, 178; Cochran vs. Roundtree, 3 Strob. 217.) The Sheriff has no authority to deal with the property of a defendant in execution, except such as is conferred by positive law, and this must be pursued if he would avoid personal responsibility. Sheriffs’ sales are directed to be made for cash, (A. A., 1839, sec. 58, 11 Stat. 37,) and a summary and effective method of insuring compliance by purchasers with their bids is furnished in the power of resale. But this involves the retention by the Sheriff of the possession in the interval. He cannot always prevent irresponsible persons from bidding, and if from such cause loss result upon the strict execution by him of his power of resale, it is the misfortune of those interested in the property and its proceeds; the law imputes no fault to him. But by delivery of possession to the purchaser, though without payment, the sale is consummated beyond his power of recall, and he has made himself responsible for the amount of the purchaser’s bid. His remedy by resale is gone, and though, for his own indemnity, he may resort to his action upon the contract of sale, if the purchaser is irresponsible, and he fail to make the money, the loss is his own. It is said, however, that the delivery here was upon a secret condition, whereby the title was not to vest in the purchaser until payment of his bid. It may be well doubted whether the Sheriff can prevent the effect of delivery by annexing thereto any secret or private conditions or qualifications, verbal or otherwise, by arrangement with the purchaser, so as to affect the rights or inter *92 ests of third persons. (Yide remarks of Wardlaw, J., in Cochran vs. Roundtree.) If he chooses to assume the bid, and make himself the creditor of the bidder, he may, doubtless, stipulate for any efficient and prompt means of enforcing payment of the debt, and 'the stipulation will be good against the purchaser. But, in doing this, the Sheriff has put off the character of the officer, and acts in his individual capacity. If the condition which the Sheriff as such annexed to his delivery of the negro slaves to John R. Spann, Jr., was void as against all persons other than Spann himself, because not within the Sheriff’s official competency, the sale was completed by that delivery, and satisfaction of the execution debt resulted. It is not, however, necessary, for the purposes of the present case, to resolve this doubt, and rest the judgment upon a denial of the validity of that condition. The delivery without payment was really the act of the creditor, under whose execution the property had been seized and sold. The Sheriff acted by his instructions. Without the privity of the defendant in execution, the creditor had privately agreed with the bidder, that the latter might buy the property, and have time for the settlement of the bid to his satisfaction, by payment, or otherwise, until the next sale-day. As security for the bidder’s fulfilment of his part of this agreement, the creditor stipulated that, if such settlement were not made, the property might then be reseized and resold under the execution. It may be conceded that, by the consent of all parties interested, a sale by the Sheriff may be made on credit. But when the execution creditor singly, and without the concurrence of the debtor, undertakes to dispense with the payment in cash, and direct the property to be delivered upon the bidder’s promise to pay subsequently, he is to be understood as thereby accepting the bidder’s promise in payment of his execution. In such case a stipulation for reseizure and resale is merely the security *93 which he takes for the bidder’s performance. And the resale by the Sheriff in pursuance thereof is not under the authority of the original execution, but as the agent of the creditor, and by virtue of the agreement, as in the sale of a mortgaged chattel. This is, at least, so far the case as to render it inequitable to throw upon the debtor any loss resulting from the g-iving of such credit to the bidder.
But let it be assumed that the delivery upon this secret reservation was the act of the Sheriff, and that the condition was valid, except as against the subsequent creditors of, and purchasers for, valuable consideration from John E. Spann, Jr., without notice, and prevented the effect which would otherwise have been wrought by such delivery. The bid of the purchaser not having been paid, and the bidder being known to be irresponsible, the course prescribed by the law, and most proper for the interests of all concerned, was a prompt resale. The evidence gives the assurance that a resale on the next succeeding sale-day, or, it may be inferred, at any early day thereafter, would have resulted in actual satisfaction. But no such resale was effected until after the lapse of nearly five years. • And upon this resale ten negro slaves, which at the first sale brought, and were certainly worth, two thousand five hundred and twenty dollars, were sold for the trifling sum of one hundred and fifty dollars. How is this difference to be accounted for ? Property is often sold under execution at very inadequate prices, and if responsibility for the depreciation cannot be fixed upon any one, it must be regarded as the result of untoward circumstances in the condition of the community, or of some mere casualty, and is the debtor’s misfortune. Is this the case here ? It does not appear, nor is there any reason to believe, that, at the date of the second sale, there was any unusual scarcity of money, still less ¡that property of this kind had so fallen in the market, that a fair lot of ten negroes would only aver *94 age fifteen dollars per head. But facts are proved which fully explain this remarkable difference in prices at the two sales. The condition verbally attached to the delivery of these negroes to John R. Spann, Jr., at the first sale, which, it has been assumed, prevented the title from vesting in him as between himself and the Sheriff, could not avail against his subsequent creditors, or subsequent purchasers from him for value, without notice. That there were such creditors, at least, seems almost certain from the evidence. That there were even liens by execution, which, in the interval, had attached upon his title, in behalf of such creditors, appears in the highest degree probable. The liability of this property to a resale under execution against Eleanor Spann, administratrix, after nearly five years possession of John R. Spann, Jr., in the face of his creditors, under a title derived through an open, public, judicial sale, consummated by immediate delivery, might well be disputed and brought into a degree of doubt, abundantly sufficient to deter bidding. The right of the Sheriff to reseize and resell had, for the two years, next preceding the resale, been questioned and resisted even by Spann himself, so that resort to an action at law for its vindication became necessary, and at the resale various persons are found interposing claims in divers rights,. and forbidding the Sheriff’s proceeding. At the first sale there was no such interference; the liability of the property for the satisfaction of the executions under which it was sold was not then questioned. It cannot be doubted that the gross inadequacy of the price at the resale, and the consequent loss, are to be attributed to the operation of these causes, and-the obscurity in which the liability of the property had thereby become involved. Who is responsible for the existence of these causes, and for an opportunity for their operation? The sale originally to an irresponsible bidder; the delivery, without payment of the bid, upon a promise ' *95 of payment before tbe next sale-day or a return of tbe property for resale; the waiver of that promise by the extension of further credit, and the consequent failure to resell when satisfaction in fact would have resulted; the undisturbed and unquestioned possession of the bidder during the long period of three years, while the hostile rights of his private creditors were accruing — were all due, not to the passive neglect merely, but to the direct and active agency of the creditor, Inglesby. These were all the result of his private negotiations with the purchaser. If this were merely the ordinary case of a failure of the bidder to pay his bid, the creditor might have dispensed with a resale on the same or next succeeding sale-day, so far as to relieve the Sheriff from responsibility, but it does not henc$ result that the debtor would be without remedy for any injury to him wrought by such interference. The law surely does not design to make the interests of the debtor . the helpless sport of the caprices, the mistakes, the credulity, or mismanagement of the creditor.
The formalities required to be observed in the conduct of sheriffs’ sales are designed for the protection and benefit of those interested in the property and its proceeds, and may be waived by their common consent, (Lewis vs. Brown, 4 Strob. 293; O'Bannon vs. Kirkland, 2 Strob. 29.) In the present case the execution debtor not only did not consent to any of these departures from the usual course of proceedings, but, so far as appears, was not even informed of them. Eor any thing that is known to the Court, so far as the defendant in the execution at law knew, the debts of her intestate were all satisfied by the sale in February, 1843, and the negroes and other property remaining in the hands of the several distributees were thereby thenceforth discharged from the liability retained for the protection of the creditors, .herself and her sureties, by the order in equity of June, 1837. She may well have considered her *96 self now relieved from all further obligation of vigilance over this property, and the absolute title of each distributee to fiis or her share perfected. It is not surprising if, after this time, they were severally permitted to remove their respective property out of the jurisdiction, or otherwise dissipate it, or deal with it according to their pleasure, without question by her. And such seems to have been the fact. So also it does not appear, and there is even less reason to conjecture, that these plaintiffs, who were the sureties for her administration, assented to or even knew any thing of these qualifications and private arrangements, whereby a sheriff’s sale, consummated in the ordinary way, and operating seemingly to terminate their liability, was converted into a mere delusive show. One of them, for the specific purpose of their protection, advised by the advertisement of the land, of the opportunity therefor, attended the sale, and bid on the negroes until an aggregate had been reached sufficient for their relief, and then retired, so confident that his design was accomplished that he permitted a tract of land, which would on that day have yielded at least four thousand dollars in cash, to be bought off and discharged of whatever liability attached to it,'for a merely nominal sum. Under such circumstances, it is not equitable that the creditor should pursue the debtor further. It is still less equitable that he should pursue the sureties of the debtor, and compel them to make good the loss which has resulted from his unwarrantable and injurious dealing with their principal’s property.
II. For the purposes of the question which has thus been disposed of it has been assumed that the special provisions of the order in equity of June, 1887, continued, after and notwithstanding the partition, the liability of the distributed personalty for the satisfaction of the intestate’s debts, as it had previously existed, and its subjection to the same methods of enforcing that liability. This is the utmost *97 effect that can fairly be claimed for them, since neither the language in which those provisions are expressed, nor the avowed occasion for the qualification thereby of the order of confirmation, requires more. The first clause of the order is a simple confirmation of the partition recommended by the Commissioners in their return. The only reason assigned for any qualification to this confirmation is, that “ there are outstanding debts of the intestate;” To protect these unsatisfied creditors against any prejudice or embarrassment that would result from an absolute confirmation is the end proposed. The event made patent, what was probably known to the parties and disclosed to the Court at-the time, that these outstanding debts did not amount in the aggregate to four thousand dollars. The personalty of the intestate to be distributed was estimated at sixty-one thousand dollars. To retain in all particulars the liability of this large personalty, insured the protection designed, to the farthest bounds of reasonable demand. To understand the Court as having by its order imposed upon the titles in severalty which the parties were asking more onerous fetters than resulted from this retention, would be an imputation of disregard of the rights and interests of those parties which nothing short of the absolute necessity of language could justify. Three years had elapsed since, by the death of the intestate, the lands of which he had died seized had descended to his heirs. If the bill had sought a partition of these lands only, would a call by creditors of the intestate, claiming four thousand dollars, to have the shares after partition encumbered with a continued liability for the satisfaction of their demands, have been listened to, after the Court had been informed that there was still in the hands of the personal representative for administration personalty worth sixty-one thousand dollars? Is it any more reasonable that the Court should have done so in a proceeding for the partition of both realty and person *98 alty, where this personalty is by the order, as now construed, virtually continued in the hands of the administratrix, so far as the creditors’ rights are involved ? Does the language of the Court necessarily import that as well the land as the personalty is to be subjected to this continued liability ? The terms used to describe what it is which is to be so subjected occur twice — once, certainly, they are very general, “the property divided,” but afterwards more restrained, “slaves and. other property allotted.” The realty partitioned constituted about one-fourth part of the whole estate, and. yet, although it must be regarded as a “thing of superior rank,” it is nowhere expressly named in these terms of description. The more specific terms, “ slaves and other property allotted,” may be fairly understood as explaining and limiting the other more general words, “ property divided,” and will not be so extended as to embrace “ lands,” which are nowhere specified. Subordinate to and involved within the controlling purpose of protection to the creditor, as a means the more to insure and facilitate its accomplishment, is the provision for the ■ protection of the administratrix, by enabling her, upon'the creditors’ demand on her, the more effectively to call in the assets with the administration of which she is charged. To this end the several distributees are to give bond with surety for the forthcoming of “the property allotted to them.” Here the same general terms are used, yet no one will understand them as importing that the forthcoming of their allotments of land was to be thereby secured. It must mean only that property for the due application of which the administratrix was responsible to the creditors. The terms of-the order are satisfied by the construction ' which has now been put upon them, and any larger sense would have imposed fetters upon the titles of the parties to their respective portions of land which the Court ought not to have imposed, and therefore will not readily be held to have intended.
*99 If tbe continued liability of tbe land under tbe operation of this order were conceded, although' the creditor might in that case have resorted to it for the satisfaction of his judgment, it will not follow that, when, without such resort, he has compelled the sureties of the administratrix, upon a devastavit of the personal assets established against her to pay his debt, these can turn round upon the heir, and compel him to reimburse them out of the land which has descended to him. It may be that under the operation of the statute, 5 Geo. II. c. 7, sec. 4, (2 Stat. S. G. 570,) lands of an intestate are, equally and indifferently with his personalty, liable under process against the administrator at law, for the satisfaction of the intestate’s debts, and that the one or the other may, at the option of the creditor, be taken in execution, (D'Urphey vs. Nelson, 4 McC. 130; Martin vs. Latta, 4 McC. 128; see Jones vs. Wightman, 2 Hill, 519.) Yet certainly a distinction is firmly established in equity as to the order of their liability, as'between those upon whom the title of the intestate has been cast, (Hull vs. Hull, 3 Rich. Eq. 65; Henry vs. Graham, 9 Rich. Eq. 100 ; Lloyd vs. Lloyd, 10 Rich; Eq. 469; Goodhue vs. Barnwell, Rice Eq. 198.) It is here well ascertained that the personalty is the primary fund for the payment of the debts, and the land comes in only to its aid, and for the supply of its deficiency. This distinction was not abolished in the particular case under consideration by the order of June, 1837. It is not so in terms, and the purpose to be attained by that order did not require that it should be. If, then, the liability of the land continued for the benefit of the creditor, yet the order of its liability, as against the personalty and those claiming it or responsible for it, was not disturbed. But with the due administration of the personalty Eleanor Spann was charged. The first duty of such administration was the payment of the debts, and for this purpose the assets in her hands, and by the order retained in them notwithstanding partition, was sufficient, fifteen times over. *100 These plaintiffs were sureties for her fidelity in this very application of the personalty which her office of adminis-tratrix exacted of her. They undertook expressly that with these personal assets she would pay the debts of her intestate. It may be that under certain circumstances an administrator might himself have an equity to be reimbursed out of the realty, as, for á balance due him on his administration accounts from an excess of payments- over receipts. But it is difficult to conceive of any circumstances in which the sureties of an administrator who are only bound for the faithful application of the personalty, and whose responsibility, therefore, must cease upon its exhaustion by such application, can have such equity. Certainly, sureties responsible for the due administration of sixty-one thousand dollars of personal assets can have no claim to be reimbursed out of the realty the comparatively insignificant sum of twelve hundred dollars, which they have been compelled to pay in satisfaction of a debt of their principal’s intestate.
It may be that the-sureties are entitled, in equity, to call upon the distributees severally to contribute ratably for their reimbursement, to the extent of the share which each accepted, under the terms of liability prescribed in the order. These terms of liability, it has been seen, do not touch the lands partitioned specifically. If the liability to contribution is to be regarded as originally a personal liability of each distributee, to the extent of the value of the share of personalty received by him, or as, by the non-production of such share, converted into such personal liability, the land of the distributee in the hands of a purchaser from him cannot be subjected to the satisfaction thereof, by proceedings instituted after the purchase. This would be to make the property of a vendor, affected by no lien at the time of the sale, liable for the satisfaction of any debt afterwards established against him as pre-existing. Moreover, to the administration of such a form of relief by *101 enforced, contribution, tbe inflexible rule of tbe Court would require, that all those bound to contribute should be parties to the proceedings, that their mutual equities might be adjusted, and complete right in the particular matter be attained. The Court, for the purpose of administering such relief, cannot assume that other debts of the intestate have not been paid by one or other of the distributees, or that other facts do not exist which would affect the proportions which the particular distributees before the Court ought to be required to contribute to this reimbursement. And in the evidence produced in this particular case there is furnished very strong reason to believe that in the negro slaves, Yiney and child, and Dick and Aleck, part of the levy sold in February, 1848, and resold in November, 1847, and thereby lost to them, whoever was the gainer, Caroline M. Bice and Mary E. Spann, the distributees under whom Henry Spann holds “ Buzzard Boost,” have already contributed more than their share or ratable proportion of the whole outstanding debts of the intestate of which the Court has information, embracing the particular debt for the payment of which reimbursement is here sought. It is the opinion of this Court that the plaintiffs have no equity to be reimbursed the amount paid by them in satisfaction of the intestate’s debt to the Bank of Charleston, out of the lands of the intestate in the hands of those holding under the heirs by purchase.
III. Certainly no particular form of words" is essential to the creation of an express trust, but unquestionably an intention so to do, on the part of the person to whom such creation is imputed, is essential. Where such intention does not competently appear, no form of words will create a trust. Whether, therefore, the agreement of December 80, 1842, between Hastin Jennings and John B. Spann, Jr., of the one part, and S. Porcher Gaillard of the other part, created a trust in the purchase-money therein agreed to be paid by Gaillard, or any part of it, for the execution cred *102 itors of Eleanor Spann, in her capacity of administratrix, including the Bank of Charleston, to which the plaintiffs, haying paid the Bank, can resort for reimbursement, is a question as to the intention of the parties to that agreement. What conceivable motive had S. Porcher Gaillard to take care of the interests of the creditors of Charles Spann, Jr. ? There were no special relations existing between him and them. They were strangers to each other. Why should he concern himself to provide for their security or satisfaction ? But this supposed volunteer concern is not confined to these creditors: it embraces also the mortgage creditor of M. C. Spann, and the judgment creditors of John R. Spann, Jr., whose claims created liens on the land. So far as his participation in the transaction is involved, it is too clear to admit of dispute that his sole intention and aim in the terms he exacted from the other contracting parties was to assure to his wife’s trustees a clear, unencumbered title to the land in which he was asking them to invest her separate funds. And in conceding these terms, it is equally manifest that the single purpose.of the other parties was to satisfy this, his reasonable demand, by removing every encumbrance. This is expressly avowed, on each side, to be the purpose of all these special stipulations. It is, in no one of these, required or promised, that this particular fund shall be applied to the satisfaction of these debts, except to the extent of whatever should prove necessary to pay the bid at Sheriff’s ■ sale, in order that the effect of that sale may inure to the strength of the title which Hastin Jennings was to transfer, and thus to relieve Jennings, who must be the bidder, from the liability to pay his bid from his own means. The Chancellor below has not erred in his judgment upon the construction of this agreement. It created no’trust.
It is ordered that the decree of the Chancellor, in so far as it subjects the tract of land.called “Buzzard Roost,” *103 now held by the defendant, Henry Spann, to contribution towards the satisfaction of the judgments recovered by the Bank of Charleston and the executors of ¥m. H. Inglesby, severally, against Eleanor Spann, as administratrix of the estate of Charles Spann, Jr., or towards the reimbursement of the sum paid by the sureties on the administration bond of the said Eleanor, in satisfaction of the former of ¿hese judgments, and in so far as it dissolves the injunction ordered heretofore in the cause, restraining the defendant, Joseph S. Inglesby, as surviving executor of the will of William H. Inglesby, from further pursuing his proceedings at'law against the plaintiff, William H. B. Bichardson, as administrator de bonis non of John B. Spann, the elder, on his liability as one of the sureties on the administration bond aforesaid, be reversed, and that the said injunction be made perpetual, and the said Joseph S. Inglesby, as such surviving executor, and all claiming under him, or in the same right, be perpetually restrained from proceeding at law against the said sureties on the said administration bond of the said Eleanor Spann, or either of them, or their or either of their representatives, to enforce payment of any balance claimed to be due on the judgment aforesaid, in favor of the executors of William H. Inglesby.
It is further ordered that the bill be dismissed as against Henry Spann, S. Porcher Gfaillard, John B. Spann, the younger, and James M. Jennings, as administrator of the estate of Hastin Jennings; that the costs of Henry Spann and S. Porcher Graillard be paid by the plaintiffs; and that the plaintiffs, the defendant, Joseph S. Inglesby, as surviving executor, and the defendant, James M. Jennings, as administrator of the estate of Hastin Jennings, severally, pay their respective costs, including, under the last named, the costs of Hastin Jennings, as a party to the original bill.
Dunkin, 0. J., and Wardlaw, A. J., concurred.

Decree reversed.